FRED O. PADDOCK ET AL. v. TOLEDO AND OHIO CENTRAL RAILWAY CO.

1. CONTRACT CONSTITUTING SURRENDER OF CONTROL OF ELEVATOR.

Under a contract between an elevator company and a firm of commission merchants, whereby the elevator company, for the purpose of obtaining a fixed income from the elevator, not dependent upon varying crop conditions, agreed to furnish, supply and provide the commission merchants, for a period of five years, at an annual rental, with the full capacity of the elevator for storage of grain, saving such parts thereof as might be required for other customers, and to account monthly to the commission merchants as to all sums received from such sources, with further provisions that the elevator company should employ and discharge operatives, except the secretary of the elevator company, as the commission merchants might direct, that the commission merchants, in addition to the stipulated rental, should pay all operating expenses, including salaries of elevator employees, including the secretary, and all taxes and assessments, the commission merchants are substantially in possession and control of the elevator and the employees are employees of the commission merchants, and the latter, so far as an employer may be bound by an employee, are bound by the action of the elevator employees.

2. SUCH CONTROL NOT ESSENTIAL TO BIND COMMISSION MERCHANTS.

It is not essential, where delivery of grain received by a railroad company is to be at an elevator, that the owners of the grain, the commission merchants, should have possession or control of the elevator in order to be bound by the action of those in charge of such elevator. Where the delivery was to be at the elevator, and the receipt of the grain was to be by whoever might be in charge, the commission merchants or owners of the grain would be bound by the conduct of the persons in charge of the elevator.

3. DUTY OF ELEVATOR AND RAILWAY COMPANIES.

Under a contract between a railroad company and an elevator company by which the former has the right to use certain spur tracks, the property of the latter, and without interfering with their owner's use, for general railway purposes, and keep the same in repair, and deliver all grain consigned to the latter at its elevator at a specified price per car, when delivered at the termini of certain

railroads having track connections, etc., the railroad company is required to promptly move all car loads of grain so received to the elevator, and the elevator company has a corresponding or correlative duty of promptly receiving the cars and relieving the railroad of its obligation of an insurer unless the railroad company has assumed the obligation of further responsibility with respect to the care of the grain.

**4. TERMINATION OF LIABILITY OF RAILROAD COMPANY.**

There is no liability on the part of a railroad company as a common carrier for car loads of grain delivered by it in pursuance of a contract, and standing upon spur tracks on the premises of an elevator company, laid to store grain until it could be unloaded in the elevator, notwithstanding it had the further duty of switching such cars into the elevator when demanded by those in charge and switching the empty cars away. The liability of the railroad company terminates upon delivering the cars upon such tracks.

**5. EVIDENCE OF PRACTICAL CONSTRUCTION OF CONTRACT.**

The fact that the elevator company or its lessees provided a watchman to see to the safety of the grain upon cars delivered by the railroad upon the premises of such company, and to close the cars that had been left open by the inspector of the board of trade, is evidence of the construction placed upon the contract to deliver such grain, as to its being in the possession of the consignee.

**6. RULE AS TO CARRIER'S LIABILITY—APPLICATION.**

The rule of law that stipulations varying or limiting the liability of the common carrier must be strictly construed against the carrier, has reference to the question of the extent of the liability of the carrier during the period in which he is acting in such capacity and does not have reference to the question of when the liability of a common carrier ceases by the delivery of the property to the consignee.

HEARD ON ERROR.

*King & Tracy,* and *Porter Paddock,* for the plaintiffs in error. *Doyle & Lewis,* for defendant in error.

PARKER, J.

The plaintiffs in error were the plaintiffs below and the defendant in error was the defendant below. The petition charges that the defendant in its capacity of common carrier, and perhaps also in its capacity of warehouseman, was derelict in the discharge of a duty that it owed to the plaintiff as a shipper. The petition sets forth that on and prior to September 20, 1898, the plaintiffs were partners, doing business under the firm name and style of Paddock, Hodge & Company; that the defendant is, and on and prior to the date aforesaid was, a corporation organized and existing under the laws of the state of Ohio, and a common carrier of goods for hire from Columbus, Ohio, to Toledo, Ohio. And then follow fourteen causes of action, all identical in form and every one founded upon the loss of a carload of grain; the aggregate loss is charged to have been $5,365.45, and judgment is asked for that amount.

I will read one of the causes of action:

"For first cause of action herein plaintiffs say, that on or about September 10, 1898, they delivered to defendant and defendant as common carrier as aforesaid received, to carry and deliver to the "Union Elevator" at East Toledo, 31,190 pounds of ear corn, being the property of plaintiffs, and contained in car No. 3646, initialed T. St. L. & K. C. R. R., said corn being received by defendant from R. B. F. Peirce, receiver of the Toledo, St. Louis & Kansas City railroad, and being of the value of one hundred twenty-four and 76-100 dollars ($124.76); and plain-

tiffs say, that by reason of the premises it became and was the duty of defendant to carry said goods safely, and to deliver the same to the 'Union Elevator' aforesaid.

"But defendant did not safely carry and deliver said goods, but wrongfully and negligently failed so to do, whereby said goods were wholly lost to plaintiffs, to their damage, one hundred twenty-four and 76-100 dollars, with interest thereon from the 20th day of September, 1898, for which they claim judgment."

To this petition an answer was filed by the defendant, and the substance of the answer is well epitomized in a brief of counsel for defendant in error, from which I will read:

"The first defense of the answer admits that the defendant received these several cars loaded with grain from the respective carriers who had brought the same to the city of Toledo, to be switched from the various connecting points in said city to the premises of the Union elevator; and the first defense of the answer denies every other allegation and avers that the defendant did safely carry and deliver all of said grain.

"This defense is based upon the proposition that the undertaking of the defendant was simply to switch these cars and place them on the premises of the elevator company on the sidings provided for that purpose; and that having done so the defendant's connection with the cars of grain was wholly ended unless the plaintiffs should request it to move them again from the sidings adjoining the elevator building and place them in the elevator building."

I may add that it is a little difficult to determine whether by this first defense and certain other allegations in the answer it was intended by the defendant to deny that it received and transported these goods in the capacity of common carrier, but we conclude from the evidence that there is no doubt but what the goods were received and transported at least to the premises of the elevator company, by the defendant as a common carrier.

"The second defense pleads certain exceptions from liability contained in the bills of lading under which the goods were carried to Toledo; and as to this defense the plaintiff replies averring that the switching service of defendant was not rendered under the bills of lading, and on the trial on the objection of the plaintiff, the court refused to permit the bills of lading to be introduced; so that this defense disappears in the present posture of the case.

"The third defense proceeds upon the theory that even if the goods were accepted by the defendant as common carrier to be delivered into the elevator building, that they were destroyed by fire originating without fault of the defendant while they were standing on side track awaiting the convenience of the elevator company, and not awaiting the convenience of the defendant; and that, therefore, the defendant was not liable.

"The fourth defense proceeds upon the same theory as the third with the exception that in the fourth defense it is averred that the plaintiffs themselves were in possession and management of the elevator building and property and that it was due to the unreadiness of the plaintiffs themselves to take their grain that the same was left standing on the side tracks at the time of its destruction by said fire.

"The fifth pleads that the grain was destroyed by the negligence and carelessness of the plaintiffs themselves in their management and control of the elevator. The reply of the plaintiffs admits that the

defendant received this grain from the other carriers and placed the same upon the side tracks in question which were situated on land belonging to the elevator company, but aver that those tracks were in the sole possession and control of the defendant.

"The reply further admits that the grain was destroyed while so standing on said side tracks, but denies 'that defendant used proper care and skill to prevent the destruction of said cars of grain after so placing them upon said sidings or side tracks.'

"The reply concludes with a general denial."

After the testimony was closed upon both sides, on motion or request of the defendant, the jury was directed to return a verdict in favor of defendant, which was done, and upon this judgment was entered. To this action of the court the plaintiffs excepted and now prosecute error here.

The question, therefore, for our consideration is, whether there was any evidence introduced tending to establish a liability upon the part of the railroad company as a common carrier; and, assuming that the question is presented by the pleadings, whether there was any testimony introduced tending to show a liability upon the part of the railroad company as warehouseman.

The real, crucial question, which, if determined in favor of the defendant in error, puts an end to the controversy, that is to say, settles it in their favor, is, whether the grain was delivered by the railroad company to the plaintiffs and received by the plaintiffs, or delivered to the plaintiffs in such a manner and form as required them to receive it and assume responsibility for its care. And this question depends largely, I may say entirely, upon the construction to be placed upon certain written contracts, with certain parol modifications, and the operations or transactions of the parties thereunder.

The elevator in question is situated upon the east bank of the Maumee river in the city of Toledo, between the river and the main tracks of the Ohio Central railroad and immediately north of the right of way and tracks of the Lake Shore and Michigan Southern railroad. It is situated upon higher ground than the tracks of the Lake Shore & Michigan Southern railroad which run through there in a deep cut. Upon the elevator grounds there were six tracks, two of which entered the elevator building and all of which connected with the main track of the Ohio Central Railway; they were so constructed as to be available as sidings for the storage of cars, and possibly might be used to some extent in the making up of trains, but they were not situated so that they could be used in the ordinary way of sidings, but were rather "spurs," since they were not open at their southern ends; they came up to the bank on the north side of the cut of the Lake Shore & Michigan Southern railroad. They had been laid down and constructed as a part of the elevator property and upon its lands, the full name of the elevator company being the Union Railroad Elevator & Transportation Company of Toledo, Ohio, and evidently were laid to be used by the elevator company as a matter of convenience to that company in the storage of cars loaded with grain until such time as that the grain might be unloaded into the elevator.

I will now read the contracts to which I have referred. The first is exhibit No. 9, of the bill of exceptions, and it discloses the relations of the plaintiff and the Union Railroad Elevator and Transportation Com-

pany and their respective rights and obligations with respect to this elevator, side tracks and adjoining grounds:

"Memorandum of agreement, made and entered into this 14th day of February, A. D. 1898, by and between the Union Railroad Elevator and Transportation Company of Toledo, Ohio, party of the first part, and Fred O. Paddock, and James Hodge, partners as Paddock, Hodge & Company, of the same place, parties of the second part, witnesseth:

"First: That the said party of the first part being desirous of obtaining a fixed income from its Union elevator in Toledo, Ohio, aforesaid, which shall not be dependent upon the varying conditions of crops and grain markets, and in and for the considerations hereinafter set forth to be paid and performed by said parties of the second part, does hereby agree to and with said parties of the second part and their successors, from the 15th day of February, A. D. 1898, to the 15th day of February, A. D. 1903, to furnish, supply and provide said parties of the second part with all of the capacity of said Union elevator for the elevation and storage of wheat, corn, oats, rye and flaxseed; saving and excepting therefrom such parts thereof as may be necessary within said term for the accommodation of its other customers; provided, however, that any and all amounts received by said first party from said other customers, or any of them, by the way of storage or elevation charges, or otherwise, shall be duly accounted for to said second parties in monthly installments.

"And for the purpose of enabling said parties of the second part to utilize said elevation and storage capacity of said elevation to the best advantage during the time aforesaid, said party of the first part further agrees to employ and discharge such of its operatives and employees as said party of the second part may request, exclusive, however of its secretary.

"Second. And said parties of the second part in and for the considerations aforesaid, do hereby agree to and with said party of the first part to utilize said elevator and storage capacity of said elevator as hereinbefore provided, during the term aforesaid, and to pay therefor the following sums of money, to-wit:

"For the year ending February 15, 1899, the sum of $15,000.

"For the year ending February 15, 1900, the sum of $14,520.

"For the year ending February 15, 1901, the sum of $14,040.

"For the year ending February 15, 1902, the sum of $13,560.

"For the year ending February 15, 1903, the sum of $13,080.

"The amounts so to be paid as aforesaid, to be so paid to said party of the first part in equal installments, the first of which shall be payable on the first day of April, 1898, and the remainder quarterly thereafter, upon statements to be rendered by the secretary of said party of the first part.

"And during each of the years aforesaid said parties of the second part further agree to pay said party of the first part as additional annual compensation for said elevation and storage capacity of said elevator, 1st, such sum as shall be equal to all taxes and assessments levied and assessed annually upon said Union elevator and the lands connected therewith and appurtenant thereto, including the taxes and assessments which are payable thereon in June, 1898, and excluding those due and payable after December, 1902; 2nd, such sum as shall equal the amount of the annual premium on $135,000.00 of fire insurance on said elevator building and its appurtenances from and after the said 15th day of February, 1898; 3d, such sum as shall be equal to the annual opera-

ting expenses of said Union elevator, including as such the salary of the secretary of said party of the first part, and the wages of its employes, office rent, telephone, fuel, office, engine and elevator supplies, etc. ; 4th, such sum as shall be equal to the amounts paid by said party of the first part for the maintenance of said elevator and for all repairs to the same, and the appurtenances thereunto belonging that may be necessary to keep the same in the condition they are now in, reasonable wear and tear and casualties by or from the elements excepted ; also excepting damages resulting from defects in machinery in, upon or about said premises at the date of the execution of this contract, or from the acts of God, and riot or insurrection ; 5th, such sum as shall be equal to any amounts which said party of the first part may be obliged to pay to any of its employes or others by reason of any injuries that may be sustained by them in or around said elevator or its appurtenances, including as such any attorneys' fees incurred in defending any actions brought therefor.

" In witness whereof, said party of the first part has hereunto caused its corporate name to be signed by Alexander Backus, its president, and said parties of the second part have hereunto set their hands on the day and year aforesaid."

It is signed by the parties.

It appears that at the time of the loss of this grain and for some time prior thereto, Paddock, Hodge & Company had been operating this elevator under and in pursuance of the terms of this agreement and in substantial accord therewith; that they paid all these operating expenses including salaries and wages of the men, and though they may not have assumed to exercise it to any extent, they had the right to discharge employees, or, what amounts to the same thing, to require the elevator company to discharge employees, except only the secretary; the secretary having certain duties to perform with respect to the public that would make it inconsistent, perhaps unlawful, for Paddock, Hodge & Company, as the buyers and storers of grain, to have such exclusive control over that elevator as would result from the right to control the operations of the secretary, who gives out the warehouse receipts showing the amount of grain stored.

Our conclusion upon a construction of this contract and the undisputed evidence with respect to the operations under it, is that Paddock, Hodge & Company were substantially in possession and control of this elevator at the time of the loss of this grain and that the employees there were the employees of Paddock, Hodge & Company, and that to the extent that they could be bound by the action of the employees in the line of duty, Paddock, Hodge & Company were bound by the action of such employees in the premises. That, however, we do not deem entirely essential to the determination of the question involved. It is clear to our minds that whether they had this absolute control or not the delivery was to be at the elevator and the receipt of the grain was to be by whoever might be in charge of the elevator, and that therefore the plaintiffs would be bound by the conduct of the persons in charge of the elevator whether plaintiffs were in possession of and operating the elevator or not.

I call attention not to the agreement which fixes the respective rights and responsibilities of the plaintiffs and the defendant, with respect to one another. This is an agreement entered into between the Union Railroad, Elevator & Transportation Company and the Toledo & Ohio Central Railway Company with respect to the transportation of cars

loaded with grain from the various Toledo termini of certain railroads entering the city of Toledo, to the elevator or the elevator premises; but it appears from the evidence, we think beyond dispute, that this contract, with certain modifications as to rates, was adopted by Paddock, Hodge & Company who stepped into the shoes of the Union Railroad, Elevator & Transportation Company and occupied the same position that they did with relation to the railroad company. If there could be any doubt about this, we think it is entirely clear that the oral arrangement, if it was intended to set aside this written agreement altogether, was substantially the same and should receive the same construction :

"Articles of agreement made and entered into this 13th day of May, A. D. 1895, by and between the Union Railroad, Elevator and Transportation Company, a corporation under the laws of Ohio, party of the first part, and the Toledo and Ohio Central Railway Company, also an Ohio corporation, party of the second part.

"Witnesseth : That whereas the party of the second part owns and operates a railroad near to and adjoining the property of the party of the first part in and about the elevator building of the party of the first part, and

"Whereas, the party of the second part makes use of these spur tracks in the transaction of its general railway business,

"These spur tracks had not been theretofore described, but they are described farther along.

"Now, therefore, it is understood and agreed between the parties hereto, that all said railway tracks connected with the railroad of the party of the second part, and located upon the land of the party of the first part, or on such portions of Yondota street near to and adjoining said land, of which first party has the right of use for railway purposes, are the property of the party of the first part, and the party of the second part has no ownership therein."

In other words, the six open tracks were the property of the elevator company and the railroad company has no ownership therein.

"The party of the second part, in consideration of the right to use said tracks in the transaction of its business, agrees to keep the same in good repair, so that said tracks may be safely operated, and further agrees to promptly switch cars to the elevator of the first party from all railroads with which the second party now, or hereafter may have, direct track connections, (said railroad now having direct connections with the Lake Shore & Michigan Southern, The Pennsylvania Company, and The Toledo Belt Railway Company) at a switching rate of one dollar per loaded car. No charge to be made for switching empty cars, or cars reaching the elevator over the T. & O. C. Ry."

"It is further agreed, that in operating and using the same in the transaction of its general business, the said second party will so operate and use said tracks as not to interfere with the use of them by the party of the first part; it being understood that the use hereby granted to the second party is in no wise to interfere with the use of the same by the party of the first part in the transaction of its business in and about its elevator as aforesaid.

"It is further agreed, that this contract may be terminated by either party upon twelve months' notice in writing."

And this contract is signed by the parties. Now it appears that in operating under this contract (a fact properly to be considered in determining the obligations of the parties, since it evidences the construction

they put upon it), the defendant company would, upon the arrival of cars loaded with grain consigned to Paddock, Hodge & Company at the Union elevator, immediately proceed with a locomotive to the Toledo termini of the different roads with which it had this track connection, hitch on to the cars and bring them to the grounds of the elevator company. If the elevator were in operation and there were no cars in the way to prevent, or if directed to do so by the person in charge of the elevator, they would at once push these cars into the elevator, from which position they might be unloaded. They could not be unloaded from any other position but from two certain tracks, numbered five and six, respectively, inside of the elevator. These tracks inside of the elevator had a capacity of ten cars. The elevator had a loading capacity, that is to say a speed, of about ten cars per hour—perhaps they could be unloaded in a little less than an hour. If the elevator were not in operation, or if they were directed to do so, or if the tracks in the elevator were full, the persons in charge of the switching engine would cause the cars to be pushed upon certain other of these storage tracks, to-wit, Nos. 1, 2, 3 and 4, and there they would be deposited and remain until such time as the persons in charge of the operation of the elevator would direct the operators of the switching engine to place them inside of the elevator in position to be unloaded. In these operations it was not customary (and it is clear that it was not expected), to give to plaintiff any notice of the arrival of these cars upon the premises of the elevator company otherwise than as notice was conveyed to the persons in charge of the elevator and in charge of the matter of the placing or the directing of the placing and the unloading of the cars. These persons, at the time of the loss of these carloads of grain, were Mr. Parks, the superintendent of the elevator and a Mr. Smith, who was a subordinate of Mr. Parks. It appears that at times the plaintiffs would have consigned to them and arriving in the city over the different lines of railroads upwards of one hundred cars per day; I think one witness says as high as two hundred cars per day, at times. The contract, as well as the law, required the railroad company to *promptly* move these cars from the termini of the different roads upon which they would arrive to the elevator, and this rule of law and provision of the contract as well, imposed upon the plaintiffs a corresponding or correlative duty of *promptly* receiving the cars and relieving the railroad company of its obligation of an insurer, it being, in the transportation of the grain a common carrier and therefore an insurer of its safety. Upon the delivery of the carloads of grain at the point agreed upon, this liability terminated, unless by express agreement the railroad company had assumed the obligation of further responsibility with respect to the care of this grain. We do not find any evidence tending to prove that the railroad company had agreed to any extension of its liability as a common carrier.

From the whole situation, the operations under this contract and as well from the terms of the contract itself, it seems to us clear that the elevator company in the first instance, and Paddock, Hodge & Company as successors to their rights in the premises, reserved the right to the use of these tracks for their convenience for the storage of cars loaded with grain until such time as it became convenient for them to have it unloaded, and that they required prompt delivery of the cars at this point and upon these tracks for the very purpose of relieving themselves of the expense of possible warehouse charges, either on the part of other railroads entering Toledo or on the part of the defendant company

—for the custody and safe keeping of those cars loaded with grain. We think that under this contract requiring the railroad company to promptly deliver these cars it could not have sustained a claim against the plaintiffs for the safe keeping of the cars or for the custody of the cars as warehouseman, so long as the plaintiffs provided sufficient capacity for the storage of cars upon their spur tracks at the elevator. It is true that as the contract was construed by the parties and as they operated under it (and that seems to have been a fair and reasonable construction of it) after the cars were brought to the premises of the elevator company and placed upon these spur tracks the railroad company had not discharged its whole duty to the plaintiffs under the contract; the further duty rested upon the railroad company of moving these cars about, when called upon to do so by the persons in charge of the elevator, and putting them in convenient position to be unloaded; and after they had been unloaded the further duty devolved upon it of pulling away the empty cars and returning them to the railroad from which they had been received; but we do not understand that, under the contract or under the law, this duty of switching cars or of moving them from place to place upon these spur tracks, was a duty devolving upon it in its capacity of common carrier; we think it was an entirely independent duty, though not arising under a distinct and independent contract, but arising under the same contract. In our opinion its responsibility as common carrier ended with the delivery of the cars to the premises of the elevator company and the placing of them in such places as may have been designated by the persons in charge of the elevator. That this is the proper construction of the contract further evidence is furnished in the fact that after the arrival of the cars at this point, a watchman was provided by the plaintiff, or the elevator company, to see to the safety of the grain upon the cars, to close the cars that had been left open in the course of inspection by the inspector, whose duty it was, he being an officer appointed by the board of trade, to inspect the grain in the cars before it was elevated into the bins of the elevator; and the performance of this act by the inspector, was not simply an inspection of the property on behalf of the consignee, to see whether it came in good order, but it was an inspection to determine whether the grain was of a character permitting it to be placed in the elevator and was simply to mark it or grade it, and this was something required to be done, not by the railroad company, but independently of the railroad company, in order that the consignee might receive the grain into the elevator.

It is urged that there is a rule of law that stipulations varying or limiting the liability of the common carrier, are to be strictly construed as against the carrier, but we do not understand that this rule of law has any application to the facts of this case, that it has any reference to the question of when the liability of a common carrier ceases by the delivery of the property to the consignees; but it has reference to the question of the extent of the liability of the carrier during the period that he is acting in the capacity of a carrier. Here the railroad company is not described nor characterized in the contract as common carrier, warehouseman, or otherwise, and its true character at every stage of progress in performing the duties devolving upon it under the contract, is to be determined by the nature of these acts and duties. We discover no stipulation in the contract of which it may be fairly said that its purport, intent or effect, is to limit the obligations of defendant as

common carrier, and therefore nothing calling for an application of the rule of construction invoked.

The cars in question, loaded with this grain which was destroyed by the fire, were received upon different days, between the twelfth and the twentieth of the month, so that some of them had been standing upon the tracks of the elevator company for seven or eight days before they were destroyed. Some of the cars of grain were received on the very day of the fire, the fire having begun at about 8 : 20 o'clock in the evening. With respect to those which had been thus placed on the spur tracks it seems to be undisputed that they had been placed there as directed by the persons in charge of the elevator; and there seems to be no question but what the cars had been delivered into the elevator as rapidly as the railroad company had been called upon to deliver them there. The last cars were received between four and half-past four in the evening of September 20th, and it is declared by the persons in charge of the switching engine, and it is undisputed, that they were directed by the person in authority at the elevator to not place any more cars inside of the elevator that evening. We think there is no question but what these cars were delivered there in due season and at a proper hour to be received, and no objection was made to the time, nor to their being received upon these spur tracks. The testimony shows beyond question that the elevator had been operated during that season of the year continuously, day after day, until near the hour of midnight; but upon this particular evening, Mr. Parks declared that they were not going to run late because they were going to clean up the elevator and do some other work and were tired out, and therefore it was that at his instance these cars were placed upon the spur track.

We think that these conclusions result naturally and necessarily from the undisputed evidence in the case. That there were no disputed facts, essential to a determination of the matter that should have been submitted to a jury by the court. To be sure, in the testimony of Mr. Mills and Mr. Paddock, and perhaps others testifying on behalf of the plaintiffs, there are certain declarations of their conclusions as to the rights and obligations of the parties under these contracts, but that testimony, of course, we are bound (as was the court below) to disregard; it is only the testimony as to facts that can be considered, and we think that these written contracts and the other undisputed evidence called upon the court to give a construction to the contracts, and to declare it to the jury as the contractual rights and obligations of the parties in the premises, and that therefore the court was justified in directing this verdict. There is a great deal of learning running along these lines as to the rights and obligations of common carriers and shippers, and counsel have shown a great deal of diligence and discrimination in the bringing forward of authorities, but according to our views the well settled elementary principles of law determine the rights of the parties here and there is no close question of law involved, and for that reason we have not taken occasion to review these authorities. Holding these views, the judgment of the court of common pleas will be affirmed.